Whitaker, Judge,
delivered the opinion of the court:
These two cases involve certain cargo which was unloaded from the vessel Collingsworth in Batavia, Java, in 1942, and which plaintiffs allege was taken by the defendant for a public use.
A total of nine related petitions have been filed in which the plaintiffs claim they are entitled to just compensation for varying lots of cargo shipped on the Collingsworth. The two cases presently before the court have been selected by the parties as test cases, and our decision as to them will determine the disposition to be made of other similar claims.
The B. 3. Collingsworth, which was owned by the United States Maritime Commission, was chartered in March. 1940 to American Mail Line, Ltd., for a period of three years for operation between ports on the Pacific Ocean. On or about November 1, 1941, the vessel sailed from Seattle, Tacoma, and Vancouver carrying a cargo of general merchandise consigned to various persons in Shanghai, Hongkong, and points in the Philippine Islands. Because of the imminence of war between this country and Japan, and to prevent the capture or destruction of the vessel by the enemy, the master, Captain Stull, was ordered by the United States Navy to proceed to Honolulu for further orders from the Navy.
After the vessel sailed, Captain Stull received a succession of orders from various sources concerning what course he should pursue. He first received routing instructions from the United States Navy to proceed to Manila by way of Torres Strait and Molukk Passage. These routing in *414 structions were subsequently changed so as to require him to proceed to Manila by way of Port Moresby in New Guinea, and Thursday Island, an Australian port. After arriving at Thursday Island on December 6, the vessel departed for Manila on the same day, but was forced to turn back on December 8 because of the chief engineer’s illness. While returning to Thursday Island the vessel was ordered by the United States Navy to put in at the nearest friendly port, because of the outbreak of war.
After returning to Thursday Island on December 9, the Collingsworth received orders from either the United States Navy or the Australian Navy to proceed to Port Darwin, Australia, or to Java, as Captain Stull preferred. The vessel sailed on December 9 and arrived in Port Darwin on December 12, where she remained until December 22, awaiting Navy orders.
In the meantime, American Mail Line was attempting to secure definite instructions from the United States Maritime Commission to unload the Collingsworth cargo, so as to free the vessel and also to afford itself protection against its bill of lading obligations. Either the American Mail Line itself, the master of the vessel, or the Maritime Commission requested permission to discharge her cargo at Port Darwin, but this permission was refused by the Australian authorities, because of a lack of warehouse facilities. Finally, on December 22, the Commission ordered American Mail Line to discharge the Collingsworth cargo at the nearest safe port of refuge offering protection to the interests of the cargo owners. The vessel was then to proceed to New Caledonia to load chrome ore, after which she was to return to the United States.
On December 22,1941, the Collingsworth left Port Darwin for Oosthaven in the Netherlands East Indies, pursuant to instructions from the United States naval representative at Port Darwin, and arrived there on December 30. There were no cargo storage facilities at Oosthaven and the vessel left there on December 31 under advice from Dutch naval officials to proceed to Batavia in Java.
The vessel arrived at Batavia on January 1, 1942, and awaited permission to discharge her cargo. On January 9, *415 pursuant to orders from the American Mail Line to Captain Stull, the Collingsworth commenced unloading her cargo into Godown (warehouse) H in Batavia, and by January 20 had discharged practically all of her cargo.
On January 22, 1942, the Collingsworth received instructions from the Dutch naval authorities to proceed to Singapore, where she was to take on tin and rubber for transport to the United States. After these instructions had been carried out, the vessel returned to Batavia, took on some rubber and tinplate at Sourabaya in Java, and returned to the United States, by way of Ceylon.
From the time the vessel left Singapore she proceeded under instructions received at different times from or through representatives of the Governments of the United States, Great Britain, and the Netherlands. From the time the vessel originally began her voyage on November 1, 1941, American Mail Line had no control over the ship’s procedure.
There is no evidence that the defendant ever attempted to requisition the vessel’s cargo. It appears that Captain Stull, the American Mail Line, and the United States Government all wanted the Collingsworth to be unloaded at Batavia, or any safe port in the area. The primary motive of the defendant in wanting the vessel unloaded was to obtain use of the vessel. The American Mail Line wanted the cargo unloaded in a safe port so as to terminate its liabilities under the bills of lading and to secure the safety of the ship and crew by permitting a departure to safer areas.
The American Mail Line addressed three successive sets of letters to all shippers of cargo on the Collingsworth after the outbreak of the war. The first set, dated variously from December 23 to December 29, stated that the Collingsworth had proceeded to Darwin because of military events, and that instructions had been received from United States Government authorities to discharge all cargo at Darwin or at some other place which, in the discretion of the master, was best designed to secure protection to the vessel and her cargo. This letter also stated that the discharge of cargo would be at the shipper’s sole risk and expense.
*416 The second letter, dated January 2, 1942, stated that the cargo was then in Batavia, and that all conditions set forth in the earlier letter still applied.
The third letter, dated January 13, 1942, stated that the cargo had been discharged at Batavia and placed in a first class warehouse in the shipper’s name and at the shipper’s risk.
After receipt of the third letter, some of the shippers requested the ship’s agent in Batavia to deliver certain portions of the cargo to designated persons or firms in that region, and in most cases these requests were followed. The evidence does not reveal whether or not Pemberton & Penn Federal, Inc., one of the plaintiffs herein, made such a request with respect to its tobacco, or whether the tobacco in question was ever delivered to anyone from the warehouse in Batavia.
After it received the third letter, Carnation Company, the plaintiff in the second case before the court, entered into negotiations with the British Ministry of Food, for sale of its cargo of canned milk to the latter. Carnation obtained the necessary license to sell, and delivered a surety bond to American Mail Line to induce it to make delivery to the British Ministry of Food. On or about February 11, 1942, an agreement of sale was finally reached between Carnation and the British Ministry of Food. However, the evidence does not establish that delivery was ever made and Carnation was not paid since it was not able to prove delivery in Batavia.
On March 5, 1942, the Japanese invaded Batavia and the fate of the cargo in Godown H is not known, although unspecified parts of it had been delivered to local purchasers prior to Japanese entry.
Upon these stated facts, the plaintiffs say that the defendant took their property for a public use, and that they are entitled to recover just compensation for the taking. We find no merit in the plaintiffs’ contention.
In the entire record we can find no evidence that the United States Government ever took or appropriated any part of the cargo of the Collingsworth. The evidence reveals that the defendant wanted the Collingsworth unloaded *417 so that the empty ship could be reloaded with strategic materials which were badly needed in the United States. Indeed, the plaintiffs readily admit that the defendant had no use for the property in question and did not in fact use it, and that the defendant’s objective was to secure the cargo carrying capacity of the Collingsworth.
Plaintiffs take the position that since the movement of the Collingsworth was directed, to a large extent, by the defendant from the time the vessel began its voyage, the defendant exercised sufficient control over the cargo to constitute a taking of it. We cannot agree.
Shortly before the outbreak of the war and during the war, the United States undoubtedly directed the movement of practically all vessels flying the American flag. This result was inevitable in view of the grave crisis then facing the nation. It was to the interest of all that every vessel be protected as much as possible under the circumstances, and the United States Navy attempted to route the vessels so as to provide maximum protection. We do not believe that it can be seriously contended that the mere routing of a vessel by the Navy is sufficient to establish a taking of the cargo of that vessel, especially when the defendant has no need for the cargo and no intention whatever to take it.
Plaintiffs intimate that the orders to discharge the cargo at Batavia were given by the defendant, and that the owners of the vessel were opposed to such action. However, the evidence reveals that Captain Stull received orders from the American Mail Line to unload the cargo at Batavia. The American Mail Line previously had sought and obtained instructions from the Maritime Commission to unload the cargo at the nearest safe port. From the evidence it seems apparent that Captain Stull, the American Mail Line, and the defendant all wanted to have the cargo unloaded as quickly as possible, and even if the defendant had been solely responsible for discharging the cargo at Batavia, we do not think this would have amounted to a taking of the cargo.
At the time the cargo was unloaded, Batavia was in friendly hands and it did not fall into enemy hands until March 1942. After the cargo was unloaded its owners were notified as to its whereabouts and, at the request of some *418 of them, the ship’s agent in Batavia delivered certain items of the cargo to designated persons or firms in that region. The plaintiff Carnation Company entered into a contract to sell the cargo it owned. This evidence indicates almost conclusively that the owners of the cargo, and not the defendant, had control of the cargo after it was unloaded.
It is true that the cargo of the Collingsworth might not have been lost had the vessel not been ordered to Batavia. However, the routing of the Collingsworth to Batavia was one of the fortunes of war which affected many innocent parties. Plaintiffs are not entitled to recover since they have failed to establish that the defendant took their property for a public use. Their petitions are therefore dismissed.
It is so ordered.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner C. Murray Bernhardt, makes findings of fact as follows:
1. These cases have been selected by the parties as test cases to submit to the court the questions of law and fact presented in a group of nine petitions in which are made claims for just compensation with respect to certain cargo shipped on the vessel Collingsworth. Although the parties to the Pemberton & Penn claim originally agreed to separate the issue of liability for trial pursuant to order, since then they have elected in writing to submit it on all issues on the basis of the existing record.
2. The 8. 8. Collingsworth was a vessel owned by the United States Maritime Commission and, in March 1940, chartered to American Mail Line, Ltd., for a period of three years for operation between ports on the Pacific Ocean.
3. On or about November 1,1941, the CoUingsworth sailed from Seattle, Tacoma, and Vancouver bearing a cargo of general merchandise consigned to various persons in Shanghai and Hongkong in China, and Cebu and Iloilo in the Philippine Islands, in that order. Before sailing from Seattle the *419 master of the vessel, Captain Stull, received from the United States Navy sealed orders instructing him to proceed to Honolulu for further orders from the Navy, and routing instructions to proceed to Manila via Torres Strait and Molukk Passage.
4. Arriving at Honolulu on November 14, Stull received from the United States Navy further sealed orders and routing instructions changing his existing orders so as to require him to proceed to Manila via Port Moresby in New Guinea, and Thursday Island. Pursuant to these instructions the Collingsworth left Honolulu on November 15 and arrived at Thursday Island, an Australian port, on December 6. She departed Thursday Island the same day for Manila but turned back to Thursday Island on December 8 because of illness of her chief engineer. While returning to Thursday Island on December 8, the Collingsworth was ordered by the United States Navy to put in at the nearest friendly port (in her case, Thursday Island) because of the outbreak of war.
5. Arriving back at Thursday Island on December 9 with a low water supply not there replenishable, the Collings-worth received orders from either the United States Navy or the Australian Navy to proceed to Port Darwin, Australia, although Stull had the option to proceed to Java if he preferred. On December 9 the Collingsworth left Thursday Island for Port Darwin (instead of Java because of the shorter distance), arriving there on December 12. She remained at Port Darwin until December 22 awaiting Navy orders to proceed. Stull was not permitted by the Australian authorities at Port Darwin to unload his cargo there because of lack of warehouse space.
During the period she remained at Port Darwin the Col-lingsworth was represented by local agents appointed by the United States Navy for the purpose of obtaining payroll funds, water, oils, etc.
6. In the meantime, American Mail Line was endeavoring to secure from the United! States Maritime Commission rlefiriite instructions to unload the Collingsworth cargo so as to free the vessel and, at the same time, afford itself some degree of protection against its bill of lading obligations. But the Commission withheld such instructions pending *420 advice from the Navy. Finally, on December 22, the Commission ordered American Mail Line to discharge the Collingsworth cargo at the nearest safe port of refuge offering protection to the interests of the cargo owners, and thence to proceed to New Caledonia to load chrome ore to return to the United States.
American Mail Line had wired Stull on December 17 at Port Darwin to await orders and, after securing authorization from the Maritime Commission, wired Stull instructions on December 23 to discharge his cargo at Port Darwin and to leave orders with the agents there to make deliveries of the warehoused cargo only on “our orders”. Stull never received these communications.
7. On December 22,1941, pursuant to orders received from the United States naval representative at Port Darwin, the Collingsworth left there for Oosthaven in the Netherlands East Indies, arriving there on December 30. The Dutch officials at Oosthaven had had no prior information as to the Collingsworth’s coming there and had no facilities for the storing of her cargo. On the following day she left Oosthaven pursuant to orders received from the Dutch naval officials to proceed to Batavia in Java.
8. The Collingsworth arrived at Batavia on January 1, 1942, and awaited permission to discharge her cargo. During the ensuing days Stull vigorously sought permission to land his cargo so that he could free the Collingsworth pursuant to his authority under clause 4 of the standard bill of lading reading as follows:
4. In any situation whatsoever or wheresoever occurring and whether existing or anticipated before commencement of or during the voyage, which in the judgment of the carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge or the usual place of discharge in such port the master, whether or not proceeding toward or entering or attempting to enter the port of discharge or reaching or attempting to reach the *421 •usual place of discharge therein or attempting to discharge the goods there, may, without giving any prior notice, discharge the goods into depot, lazaretto, craft, or other place and the goods shall be liable for any extra expense thereby incurred; or the master may proceed or return, directly or indirectly, to or stop at such other port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances, and discharge the goods or any part thereof there without giving any prior notice, and when landed as hereinabove provided, the goods shall be at their own risk and expense, the delivery thereof by the carrier shall be considered complete and the carrier shall be freed from any further responsibility in respect thereof except to mail notice of the disposition of the goods directed to the shipper or consignee named in this bill of lading at such address as may be stated herein; or the master may retain the cargo on board until the return trip or until such time as he or the carrier thinks advisable; or the master may forward the goods by any means by water or by land, or by both such means, at the risk and expense of the goods. For any services rendered to the goods as hereinabove provided, the carrier shall be entitled to a reasonable extra compensation.
However, in Stull’s own words from his contemporaneous letter to American Mail Line:
At present we’re all aback, baffled by head winds from all shore quarters here. Baffling buck passing blasts. No one seems to know what to do; or is willing to make a decision. The ship and cargo is just a small political football wound round and round with gaudy red tape. The Naval Advisor, the Consul, the Far East Head of the U. S. Maritime Commission, the NEI Dept, of Economic Affairs, President Roosevelt, the elevator boy — none can decide just what to do with us or our cargo.
*****
I told our Navy Commander Slausen that it was a crime to keep us here when this cargo is of such value in these times; and when our country is sorely in need of strategic materials. Stuff that we should have been on our way home with before this.
9. Upon arriving at Batavia, Stull appointed Ross, Taylor & Co., Ltd., as ship’s agent for the Collingsworth in order to obtain money for the crew, stores, and various things. *422 The appointment was confirmed by the American Mail Line which, for a week or more prior to receiving word on January 2,1942, from Ross, Taylor, had lost track of the vessel’s whereabouts. On January 9, 1942, pursuant to orders of the American Mail Line to Stull, via McGregor (Batavia director for Ross, Taylor), the Collingsworth commenced unloading her cargo into Godown (warehouse) H in the harbor serving Batavia. By January 20 the vessel had discharged into Godown H all of her cargo except a small and immaterial residue.
10. On January 22, 1942, and without the knowledge at the time of American Mail Line, the Collingsworth received orders through the Dutch naval authorities to proceed to Singapore, where she was to load a cargo of tin and rubber for transport to the United States. Thereafter she voyaged to Singapore, took on a partial load of tin and rubber for the United States and evacuees for Batavia, discharged the evacuees at Batavia and laid over a few days, picked up some rubber and tinplate at Sourabaya in Java, and returned to the United States via Ceylon, eventually arriving safely in New York City in May 1942. From Singapore onward the vessel traveled under orders received at different times from or through representatives of the governments of the United States, Great Britain, and the Netherlands. Throughout the voyage of the vessel from November 1,1941, onward the American Mail Line had no control over the ship’s procedure or itinerary. For example, the earlier instructions by the Maritime Commission that the vessel should load chrome ore at New Caledonia for return to the United States (finding 6) were canceled on January 5,1942, and the Commission later ordered her to load strategic commodities in the Dutch East Indies, which she did (see above).
11. a. On February 9, 1942, the American Mail Line had requested the Maritime Commission in writing to “take the vessel over on time charter form from some agreed date,” because of the actual assumption of control over the vessel by the American authorities since it left the United States on November 1,1941, and the large potential liability of the American Mail Line during the voyage of the vessel under conditions over which the carrier had no control.
*423 b. As a consequence, on March 24, 1942, the Maritime Commission authorized a recommendation to cancel the 1940 charter, referred to in finding 2, effective October 13, 1941, in the following language:
(b) The COLLINGSWORTH commenced the voyage now in progress on October 13, 1941, sailing from Vancouver November 1st for Far East ports. The voyage was interrupted by the declaration of war and the vessel was diverted to Australia to discharge her cargo. Thereafter, she was employed at the direction of the United States military authorities in Southwest Pacific and Indian Ocean areas, and the latest report is that she was in India under directions to return with cargo to U. S. North Atlantic port. This voyage, having been completely disrupted as a voyage in the subsidized service, the cancellation of the charter as to the COLLINGSWORTH should be authorized as of October 13, 1941 and employment of the vessel thereafter appropriately arranged for by the War Shipping Administration.
c. Subsequently, on April 11, 1942, the Administrator of War Shipping authorized the following:
(1) The acceptance of delivery of the vessels COLD-BROOK, CROWN CITY, SATARTIA and VEST CUSSETA, as of the respective dates they were made available for emergency operation, and of the COL-LINGSWORTH as of the date of commencement of Voyage No. 7, and their allocation to American Mail Line under the Service Agreement as of the dates mentioned above: * * *.
d. Subsequently the Collingsworth became subject to a service agreement entered into between American Mail Line and the United States, by the terms of which the American Mail Line became the agent for the United States in the operation for the government of several government-owned vessels which had theretofore been operated by American Mail Line as an independent contractor pursuant to charter agreement. The service agreement was antedated to August 3, 1941, was effective retroactively to October 13, 1941, as to the Collingsworth, and included the following provisions, inter alia:
Article 1. The United States appoints the General Agent as its agent and not as an independent contractor, *424 to manage and conduct the business of vessels assigned to it by the United States from time to time.
Article 2. The General Agent accepts the appointment and undertakes and promises so to manage and conduct the business for the United States, in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe, and upon the terms and conditions herein provided, of such vessels as have been or may be by the United States assigned to and accepted by the General Agent for that purpose.
Article 3A. To the best of its ability, the General Agent shall for the account of the United States:
(a) Maintain the vessels in such trade or service as the United States may direct, subject to its orders as to voyages, cargoes, priorities of cargoes, charters, rates of freight and charges, and as to all matters connected with the use of the vessels; or in the absence of such orders, the General Agent shall follow reasonable commercial practices;
* ‡ * ifi ifc
(d) The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. * * *
Article 8. The United States shall, without cost or expense to the General Agent, procure or provide insurance against all insurable risks of whatsoever nature or kind relating to the vessels assigned hereunder (which insurance shall include the General Agent and the vessel personnel as assureds) including, but without limitation, marine, war and P. & I. risks, and all other risks or liabilities for breach of statute and for damage caused to other vessels, persons or property, and shall defend, indemnify and save harmless the General Agent against and from any and all loss, liability, damage and expense (including costs of court and reasonable attorneys’ fees) on account of such risks and liabilities, to the extent not covered or not fully covered by insurance. The General Agent shall furnish reports and information and comply fully with all instructions that may be issued with regard to all salvage claims, damages, losses or other claims. Neither the United States nor the insurance underwriters shall have any right of subrogation against the General Agent with respect to such risks. The *425 United States may assume any of the foregoing risks except those relating to P. & I. risks and collision liabilities. At all times during the period of this Agreement, the United States shall at its own expense provide and pay for insurance with respect to each vessel hereunder against protection and indemnity marine and war risks, and collision liabilities without limit as to liability as to the amount of any claim or the aggregate of any claims thereunder. The United States at its election may write all or any such insurance, including that against P. and I. and collision liabilities, in its own fund, pursuant to a duly executed policy or policies. Neither the United States nor the insurance underwriters shall have any right of subrogation against the General Agent with respect to any of the foregoing risks. All insurance hereunder shall cover both the United States and the General Agent.
«i» «Jí *f» «i»
Article 16. (a) The United States shall indemnify, and hold harmless and defend the General Agent against any and all claims and demands (including costs and reasonable attorneys’ fees in defending such claim or demand, whether or not the claim or demand be found to be valid) of whatsoever kind or nature and by whomsoever asserted for injury to persons or property arising out of or in any way connected with the operation or use of said vessels or the performance by the General Agent of any of its obligations hereunder, including but not limited to any and all claims and demands by passengers, troops, gun crews, crew members, shippers, third persons, or other vessels, and including but not limited to claims for damages for injury to or loss of property, cargo or personal effects, claims for damages for personal injury or loss of life, and claims for maintenance and cure, [sic]
* * * * *
Article 17. Wherever and whenever herein any right, power, or authority is granted or given to the United States, such right, power, or authority may be exercised in all cases by the War Shipping Administration or such agent or agents as it may appoint or by its nominee, and the act or acts of such agent or agents or nominee, when taken, shall constitute the act of the United States hereunder. In performing its services hereunder, the General Agent may rely upon the instructions and directions of the Administrator, his officers and responsible employees, or upon the instructions and *426 directions of any person or agency authorized by the Administrator. Wherever practicable, the General Agent shall request written confirmation of any oral instructions or directions so given.
* * * *
Article 20. Subject to the provisions of Article 5 hereof, this Agreement is in substitution of and hereby abrogates and replaces the so-called 10 Bareboat Charter Agreements relating to the assigniment or allocation to the General Agent of the vessels listed on Exhibit A hereto from the dates stated on such Exhibit. Preference Agreements relating to such allocated vessels shall be terminated and abrogated as of the same dates.
All lights and obligations of the parties under said abrogated Bareboat Charter and Preference Agreements are hereby cancelled and this Agreement is made retroactive to the cancellation dates thereof as stated on Exhibit A hereto. However, the General Agent shall be reimbursed for any expenditure made before the earliest permissible cancellation date after March 22, 1942, under said agreements to the extent that such expenditure would have been considered in computing additional charter hire or freight under such agreements. This Agreement, unless sooner terminated, shall extend until six months after the cessation of hostilities.
12. The bills of lading covering the cargo here in question which was unloaded from the Collingsworth at Batavia contained the following provisiaftts, inter alia:
1. * * * The Carrier shall not be liable in any capacity whatsoever for any delay, non-delivery or mis-delivery, or loss of or damage to the goods occurring while the goods are not in the actual custody of the Carrier.
2. * * * the word “carrier” shall include the ship, her owner, operator, demise charterer, time charterer, master and any substituted carrier, whether the owner, operator, charterer or master shall be acting as carrier or bailee; * * *.
‡ $
[Paragraph 4 of the bill of lading is quoted in finding 8.]
5. The carrier, master and ship shall have liberty to comply with any orders or directions as to loading, departure, arrival, routes, ports of call, stoppages, discharge, destination, delivery or otherwise howsoever *427 given by the government of any nation or department thereof or any person acting or purporting to act with the authority of such government or of any department thereof, or by any committee or person having, under the terms of the war risk insurance on the ship, the right to give such orders or directions. Delivery or other disposition of the goods in accordance with such orders or directions shall be a fulfillment of the contract voyage. The ship may carry contraband, explosives, munitions, warlike stores, hazardous cargo, and may sail armed or unarmed and with or without convoy.
* * * * *
12. * * * The responsibility of the carrier in any capacity shall altogether cease and the goods shall be considered to be delivered and at their own risk and expense in every respect when taken into the custody of customs or other authorities. The carrier shall not be required to give any notification of disposition of the goods.
Sjí •{*
20. * * * The Carrier in making any arrangement for lighterage or warehousing of goods after discharge from vessel shall be considered the agent of the shipper, owner or consignee of the goods and shall not be responsible for any loss, damage or delay.
13. There was no United States military installation in Batavia at the time the Collingsworth unloaded there. However, a United States naval officer was stationed there, two of the evacuees from Singapore who were brought by the Collingsworth, to Batavia were United States naval personnel, and a third was a representative of the United States Maritime Commission.
There is no evidence of a requisition of the vessel’s cargo by the United States ever being served on its master. It is reasonable to conclude from all the circumstances that Captain Stull, the American Mail Line, and the United States Government all wanted the Collingsworth to be unloaded at Batavia or any safe port in the area; that neither Stull nor American Mail Line felt they were able to unload without permission of the American authorities; that Stull and American Mail Line were motivated to want to unload so as to terminate their liabilities under the bills of lading, to *428 secure the safety of ship and crew by permitting a departure to safer areas, and, at least as to Stull, a patriotic desire to return needed materials to the United States; and that the United States Government was motivated to unload the vessel not because it wanted the cargo, but because it needed the vessel itself to transport critical cargo to the United States to maintain the war effort.
14. The American Mail Line addressed three successive sets of letters to all shippers of cargo on the Collingsworth. The first of these, dated variously from December 23 to December 29, read substantially as follows:
Our S/S “Collingsworth” Voyage 7 West, with cargo aboard, shipped by/or consigned to you, as listed below, is presently at Darwin, Australia, having proceeded to such port of refuge because of military and naval events.
We are now instructed by United States Governmental authorities to discharge all cargo aboard at present port of refuge, or such other place where in the discretion of the Master discharge may be accomplished safely and most expeditiously, and with maximum protection to cargo owner’s interest, and we have instructed the Master accordingly.
Under the circumstances outlined above we hereby notify you that the vessel’s voyage is abandoned and your cargo will be discharged and at your disposal. The cargo will be at your sole risk and expense. If your cargo is discharged at any port other than Darwin we will advise you as soon as such information is available.
We shall require the return to us of all original bills of lading covering said shipments, or acceptable surety bond, before delivery to you. The ship’s agents at Darwin are Burns, Philp & Company, Ltd.
[At this point each of the first series of letters listed the particular cargo applicable to the addressee’s shipment.]
The second letter, dated January 2,1942, read as follows:
Information reaches us that discharge of your cargo from the above vessel was not effected at Darwin, Australia (as per our letter of December 29,1941) but to the best of our knowledge now, your cargo is at Batavia, Java.
All conditions per our letter of December 29,1941, apply. Our agents at Batavia, Java, are Ross Taylor & Co., Ltd.
*429 The third letter, dated January 13, 1942, read as follows:
With further reference to our letters covering your cargo ex subject vessel discharged at Batavia, Java.
Boss Taylor & Co., our agents, inform us that your cargo is placed in a first class warehouse within the Customs area at Batavia, which information we believe you should pass on to your Insurance Underwriters. Details as to name and exact location of warehouse have not yet been received; they will be furnished if received.
Cargo is landed and stored in the name of and at the shipper’s risk, who must satisfactorily guarantee payment of all charges before it will be released.
We understand that landing charge including lighterage and stacking in warehouse is about $1.00 U. S. Currency per ton of 1000 Kilos (2.2046 lbs. per Kilo) and that storage rate is one half guilder cent per ton per day.
We are available and will gladly assist you in any way possible.
15. Following receipt of the foregoing advices from the American Mail Line, some of the shippers of Collingsworth cargo requested McGregor (Boss, Taylor’s manager in Ba-tavia) , through responsible Batavian banks, to deliver certain portions of the cargo to designated persons or firms in that region, and in most such cases these requests were followed. However, it cannot be determined from the evidence which shippers made such requests, nor is it established that one of the plaintiffs herein, Pemberton & Penn Federal, Inc., made such a request, or that the tobacco in question was delivered to anyone from the warehouse in Batavia. Such a request was made, however, by plaintiff Carnation Company as related more fully in findings 25 and 26, infra.
On March 5, 1942, the Japanese invested Batavia and the fate of the contents of Godown H is not known, although unspecified parts of it had been delivered to local purchasers prior to Japanese entry.
CLAIM OE PEMBERTON & PENN EEDERAL, INC.
16. The petition of Pemberton & Penn Federal, Inc., and L. H. Burnett Tobacco Company, Inc., was filed on January 8,1948, and amended on March 23,1955, to include as parties *430 plaintiff L. H. Burnett and The Union Marine & General Insurance Company, Ltd., a United Kingdom corporation authorized to do business in the State of New York.
17. The plaintiff, more accurately styled “Pemberton & Penn, Federal Inc., U. S. A.”, was a corporation organized as a China Trade Act Corporation under the China Trade Act of 1922, as amended (15 U. S. C. 141, et seq.). It was dissolved voluntarily on May 29,1945.
On June 18, 1945, the corporation and its directors as liquidating trustees entered into a written agreement with L. H. Burnett, its sole stockholder, whereby all of the assets of the corporation were sold to him in exchange for the surrender of his stock and his assumption of the remaining debts of the corporation.
L. H. Burnett Tobacco Co., Inc., is a corporation which was formed under the laws of the State of Virginia in March 1947. The present claim, however, was never transferred by Mr. Burnett to the L. H. Burnett Tobacco Co., and is still owned by him personally.
18. The laws of the United Kingdom permit citizens of the United States to bring suit there against it.
19. On October 10, 1941, Piedmont Leaf Tobacco Company invoiced to Pemberton & Penn 100 hogsheads of tobacco, at an aggregate price of $10,908.69, “CIF & C, Shanghai, China”. Under date of December 31, 1941, Piedmont received payment for this by debiting the account of Pember-ton & Penn on its books.
This tobacco was shipped on the Collingsworth on a straight bill of lading which designated Pemberton & Penn as both the shipper and the consignee, and the original bill of lading was mailed directly to it. The original, nonnegotiable bill of lading is in plaintiff’s possession.
The tobacco was included in the cargo discharged from the Collingsworth at Batavia as related in finding 9.
20. On December 13, 1948, Pemberton & Penn received from the Union Marine & General Insurance Company, Limited, the sum of $14,970 representing the proceeds of insurance on the lost shipment, and executed and delivered to the insurance company a subrogation agreement which, in gen *431 eral, authorized the insurance company to proceed in its name or that of the subragor to recover its loss. On December 24, 1948, the check of the Union Marine & General Insurance Company, Limited, in the sum of $14,970 was deposited in the personal bank account of L. H. Burnett.
21. There is no evidence in the record as to the fair market value of the tobacco in question at Batavia beyond the “GIF and C Shanghai” invoice price referred to in finding 19.
CLAIM OE CARNATION COMPANY
22. Plaintiff, Carnation Company, is a corporation organized and existing under the laws of the State of Delaware, with its principal offices in the City of Los Angeles, California.
23. The Insurance Company of North America is a corporation duly organized and existing under the laws of the State of Pennsylvania with its principal office in Philadelphia.
24. In September and October 1941 plaintiff invoiced various purchasers in the Philippine Islands at Cebu, Davao, Iloilo, and Manila for 14,595 cases of evaporated milk at a total price of $59,972 CIF Philippine ports. No letters of credit were issued by or on behalf of the purchasers in connection with these transactions. Instead, plaintiff loaded the evaporated milk on the Coilingsworth for shipment to the purchasers in the Philippine Islands, and mailed to local financial institutions in the Philippines, to collect on behalf of plaintiff, drafts on the purchasers accompanied by invoices and original bills of lading. The bills of lading named as the “order of” consignee in each case a bank or financial institution in the Philippines and instructed that the purchaser in each instance be notified. The purchasers neither received nor paid for the merchandise, which was included in that which was unloaded in Batavia (finding 9). The drafts and the accompanying negotiable instruments were not returned to plaintiff and are presumed to be lost.
25. Following receipt of advice from the American Mail Line that the Collingsworth's cargo had been unloaded in Batavia, Carnation entered into negotiations with the British *432 Ministry of Food, for sale of the canned milk to the latter. On January 21,1942, Carnation secured a license under Executive Order No. 8389, authorizing it to make this sale, and on February 13, 1942, delivered to American Mail Line a surety bond to induce it to make delivery to the British Ministry of Food in Batavia without production and surrender of the bills of lading, which had been mailed to the financial institutions in the Philippines.
26. On or about February 11, 1942, an agreement was reached between Carnation and a representative of the British Ministry of Food for the sale to the latter of the 14,595 cases of canned milk in the warehouse in Batavia for $54,001.50, subject to payment on delivery. However, difficulties were encountered by plaintiff in securing adequate delivery instructions from the British Ministry of Food, and the milk was probably not delivered prior to the Japanese investment of Batavia on March 5, 1942. Carnation was never paid by the British Ministry of Food, since it was not able to prove delivery in Batavia. The ultimate disposition of the merchandise is not known.
27. On or about November 24, 1949, the plaintiff, The Insurance Company of North America, paid to Carnation the sum of $65,978, representing the insurance on the 14,595 cases of evaporated milk and thereby became subrogated to all the rights of Carnation.
28. The only evidence in the record as to the value of the canned milk in question, other than the original invoice price to the Philippine purchasers, is the price negotiated with the British Ministry of Food (finding 26).
29. All plaintiffs have waived interest beyond December 81,1954.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs in cases 48487 and 48488 are not entitled to recover, and their petitions are therefore dismissed.